Before we proceed to the cases which are on the docket for oral argument this morning, we have some happy business to attend to by way of an admission or admissions, I should say, to the bar of the court. In that regard, I will notice Mr. Rick Henschel, who's a member of the bar, who is going to move six admissions. That's correct. The floor is yours, Mr. Henschel. Thank you, Your Honor, and I'll be brief. May it please the court, I am a member of the bar of this court. I move to have the following persons admitted. All are members of the bar in good standing in the highest court of New York State. I personally know the credentials of each and am satisfied that they possess the necessary qualifications. Dr. Stephan Bittman, Dr. Dennis Gephardt, I'm sorry, I'm sorry, Professor Renate Dendolfo, Dr. Dennis Gephardt, Professor Geha Begum, Dr. Stephan Wilske, and Sonja Boghardt. Thank you, Mr. Henschel. Your motion is granted, and I will ask now that the various attorneys turn and face Ms. Tomlinson and take the oath of the court. Raise your right hand. Do you solemnly swear or affirm that you will report yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Say I will. I will. Welcome to the bar of the United States Court of Appeals and the Federal Circuit. Thank you, Ms. Tomlinson. On behalf of the panel and on behalf of the court, welcome to the bar of the court, and we look forward to seeing you before us. Thank you. Thank you, Mr. Henschel. We'll now turn to the business at hand. We have three cases on the docket for oral argument this morning. Before we turn to those, I will just note for the record the three cases which are being submitted on the briefs without oral argument. The first one is number 07-1152, Fisher v. Anderson. The second case is number 07-1153, Fisher v. Quad International Corporation. And the final case is number 07-3189, Hinojosa v. the United States Postal Service. Again, those cases are being submitted without oral argument. The first case in which we'll hear oral argument this morning is number 07-1047, In re Barnett. Mr. Kramer, before you start, I just want to confirm you are reserving two minutes of your 15 minutes for rebuttal. Is that correct? Correct, Your Honor. Okay. You can start whenever you're ready. Good morning, Your Honor. May it please the court, I basically have four issues for oral argument this morning. Those include the PTO's failure to judge the subject matter as a whole when assessing obviousness, the PTO's failure to present a prima facie case, the PTO's use of hindsight improperly, and the PTO's use of non-analogous art in this case. With respect to the subject matter as a whole, Your Honor. Counsel, if you don't mind, will you turn right to, for me, what is missing from Von Cohorn? Am I saying that right, as far as you know? Yes, Your Honor. Okay, Von Cohorn. What is missing from Von Cohorn, combined with Sage, in terms of the Barnett claim? Exactly, focus me in on the claim elements that you think aren't properly disclosed by those references. That are not properly disclosed? Yes, Your Honor. Certainly, if we look at, for example, claim 76 of the 378 application, one of the major pieces that is missing is the downloading to the user's remote terminal an incentive data management software module for managing the printing of incentives, wherein a printed incentive includes unique user identification information. There's nothing in Von Cohorn, or Sage, for that matter, that would teach that particular element. That element is common to all the claims issued in all three applications in this case. So that's one point, Your Honor. The second point... Okay, just out of curiosity, what about the signals that are sent to the response unit and the distribution or disbursement component? I'm trying to remember, because of course, Von Cohorn has different names for everything than Barnett would otherwise have. Of course, you'll probably say they're not just different names. But, you know, there's also another component. There's both the response unit and a separate component, disbursement. Help me out. What is it called here? There's some component in Von Cohorn. The other alternative embodiment of Von Cohorn, Your Honor, would be the program, the computer, that is already suitably programmed. So for that embodiment, we would contend that there's no need to have the user download the incentive data management software module. It presumably would already have been there if it is at all taught. And this very piece of Barnett's claim to mention is one of many that allows the actual system to work correctly, the methods to work correctly, because the user first has to register with the system. If the user is registered with the system, then presumably they would already have the software management module. If the user is not, then that software data management module has to be downloaded. And with the downloading, there's a creation of a user profile. And that user profile allows the Internet Accessible website to target specific coupons and specific incentives to a given user. There's nothing like that in SIG or Von Cohorn. But doesn't Von Cohorn disclose downloading information to the terminal that prints the incentives? I don't remember what it's called specifically. It's a special response unit. No, there seem to be two different things. There's the response unit, which I understood it to take the inputs from the individuals. And then there's also something, a disbursement or another piece of technology or hardware in Von Cohorn that disclosed disbursement, which is the unit that actually spits out the coupons or incentives or prizes or tokens or something else. My understanding is that that would be the printer you're on. And simply sending the signal to a response unit or the printer is not the same thing necessarily as sending an entire executable software management module that the user of the system can then use to first select a coupon from a subset of coupons that is presented based on the data management module, based on the user profile. Instead, simply sending signals and transmitting signals is just that. It's just a one-off piece of data. But counsel, that's not what your claim covers though, right? Your claim in this downloading limitation in particular doesn't say that this downloading has to meet all those criteria that you just articulated, that downloading to the user's terminal and instead of data management software module for managing the printing of incentives. It doesn't go into all of the further requirements that you just gave it verbally, which might be in the preferred embodiment, I grant you entirely, but that's not what the claim says that the software module has to do. And it seems to me that they do download something that causes the printing in the Von Cohorn system. Your Honor, I would contend that if you read the claim as a whole, the subject matter as a whole, then you get a better understanding for how the system operates. And if you focus on that one specific element, you can easily say, well, that is unimportant. Which claim, just to make sure I'm with you here, which claim are we talking about? Are we talking about 76 or are we talking about 63? I just read from Claim 76, Your Honor. But that contains language that is more detailed with respect to what we're talking about now than 63 as I read it, correct? I think Claim 76 is more detailed and longer, yes, Your Honor. But with respect to this particular claim limitation, right, that you were discussing with Judge Moore, because I'm not finding the detail in Claim 63 that you're referring to. I think even if you look at Claim 63, Your Honor, you will find that in general the subject matter as a whole would require the data management software module to be downloaded, and that software module is the piece of the step of the method that allows for the user to select which of the subset of coupons is presented and which of that subset they want to print. It allows the user to then print those coupons, and that information about what is printed can then be sent back to the Internet Accessible website, and then that information, once a coupon that is printed and redeemed, can also be tracked. And then when that coupon is redeemed and used, that coupon can also be, that information, that data, can also be sent to a distributor of those coupons which can then target the other additional coupons at that specific user. Well, all of that can be done, but that isn't in the limitations of 63, as I read them. It is, Your Honor, in the limitations of 76, we contend, and I'm just using that as an example. As an example with respect to how you have to assess the claim subject matter as a whole, in this case, we contend the problem with the PTO's tactics here is what they did is they said, well, if you take Von Coltmore and you put it in a different environment, i.e., the Internet, then everything would naturally follow. It's not clear that everything would naturally follow, and if you do it that way, that is not necessarily following the test of Graham versus John Deere. I mean, I think you've correctly recited what the Board did, and it seems to me the first logical step in the analysis is to make the determination of whether the prior art teaches the use of the Internet, and the Board came to that conclusion. And then I guess what I'm trying to say is didn't the Board, in essence, follow a logical approach? I mean, they say, okay, we're in the Internet environment now, and let's see if these other things line up also. I mean, I understand your argument, but I'm kind of thinking, putting myself in the place of the Board, I'm wondering what else could I have done, or what else should the Board have done? Well, I think the Board, first off, what they should have done is to not rest on the fact that everything would naturally follow simply because you changed the environment. It doesn't mean everything in the claim naturally follows. All the other steps would naturally follow. For example, I like sports analogies, which I know are always dangerous, but... Understandable level. The D.C. United play at RFK Stadium, right? In that environment, it doesn't mean they're playing baseball. Simply because you put Vancouver on the Internet doesn't mean everything about the Barnett claims is in Vancouver. No, but doesn't it turn on whether one of ordinary skill in the art at that time, which I grant you was what year, 1997? 95. 95. Okay, thank you. Which at that time I realized, and that's part of your argument, is you're using hindsight. You can't use our modern-day understanding of the Internet, which is very difficult to divorce yourself from, to go back to 1995 and understand what the Internet was then and what one of skill in the art would do. But nonetheless, the Board found, it seems to me, that one of skill in the art would know, okay, if you're going to substitute the Internet for the broadcast of Van Cohorn, that you similarly need to make modifications to the claim to affect that change. And that one of skill in the art would know how to do that, that it would be obvious to one of skill in the art how to modify the system to do that. Isn't that a question of fact coming out of the PTO? I mean, they made that factual determination that one of skill in the art would know to modify this claim once you change the Internet this element this way, or is that a question of law? Well, I think there's both a question of fact and a question of law in there, Your Honor. The question of law would be, is that an appropriate approach? Does that follow Graham v. John Deere? We contend no, because what you're doing there is you're looking at when you make one modification and then turn back and look at the claim and say, okay, well, I made that modification. Then can I make another modification? You're not looking at the subject matter as a whole. You're looking at element by element. Inherently, what you're doing there is you're finding similarities. Well, that can be similar. That can be similar. That can be similar. Isn't it possible, though, for the Board to say that this would be obvious to one of ordinary skill in the art to make these changes without pointing specifically to either Von Cohorn or Saig with regard to where that particular change is there, that just in light of those two taken together, it would be obvious to one of ordinary skill in the art to make these changes, that they don't necessarily have to point to a specific reference to disclose each and every element of the claim verbatim? Your Honor, I would contend the exact opposite. I would contend that the precedent of this Court, the Supreme Court, say that the PTO has to apply substantial evidence, and it can't just make things up out of thin air or because it thinks it's right. But can't they recognize one of ordinary skill in the art would know to make this change? It would be so obvious. I mean, a four-pronged fork to a three-pronged fork. Do they really need to find something out there that has the fourth prong in the prior art to say it's obvious? No. I believe this Court has held that in certain circumstances the examiner can recognize what will be obvious to one of ordinary skill in the art in the absence of showing a reference disclosing exactly that. In this context, Your Honor, there is no finding that one of ordinary skill in the art would automatically make those changes and know to make specifically the changes that are in Barnett's claims. All the PTO said is it would all naturally follow without any explanation as to why, and that's part of the problem. That's the hindsight. The only thing they had there is Barnett's claims. That's it. SIG doesn't teach it. Montgomery doesn't teach it. If you're using the applicant's claims, that is the exact evidence of hindsight, and you see that in the language of their decision. They take the Internet as it is today and apply it to what was known in 1995. Suppose that this idea was using RFK, which currently is a baseball field, to play football on, which I understand it was also used for, by the way, in the past, but to play football on, and the prior art reference says we suggest you play football at RFK. Do you think that the prior art reference necessarily needs to articulate removing the four bases from RFK before you do that, or would one of ordinary skill in the arts just kind of know to do that? Isn't that kind of like what happened here with the board? While they may not have said it with the particularity that you would have liked, oh, well, this claim element one of ordinary skill in the arts would know once they're using the Internet, that's how to implement it. This claim element one of ordinary skill in the arts would know once they're using the Internet, that's how to implement it. Certain things don't have to be said in explicit detail like that if one of ordinary skill in the arts would just know them. Am I making too much of a leap? I don't know. I think you're on the board making too much of a leap. For example, on page A14, with respect to certain elements in the claim of Claim 76, which is 378, they say, under such circumstances, the coupon data would have to be stored at the Internet site. Why is that true? Couldn't it have been stored at the distributor's Internet site? Why the single Internet accessible website that is claimed by Barnett? And it also goes on to say, and the user would have to request coupons from the Internet site. Well, Von Cohorn is a broadcast system. There's nothing to say that a person of ordinary skill in the arts reading Von Cohorn and view of SEG would automatically transform that into a system where the user would have to request coupons from the Internet site. There's nothing in the prior art. And to go back to your question specifically, the PTO has to have a... There must be some articulated reasoning with some rational underpinning. Wait, hold on. Let's go back to that argument you just made. So if I understood the argument you just made, it really pertains to the argument that I think is articulated well in your brief about the claim limitation from a user of a remote terminal, because you're talking about whether the user initiates the request for the coupon. And as I understood, Von Cohorn actually, at A201, column 47, lines 41 to 47, they actually teach the use... You probably don't have to look it up because you're going to remember this, but they teach the potential use of, if I'm remembering right, cable, I'm trying to find where I wrote it down, but cable connections such as cable or telephone connections used for home computers, and they teach the recipient using that to initiate and obtain the coupon information by responding at their own initiation via cable connections such as cable or telephone connections used for home computers for them to initiate and request the coupon. So why doesn't that actually teach exactly what you just said Von Cohorn doesn't teach? Because it would still... even when the environment has changed, still send out those signals. Send out, broadcast the coupons that are available in that system. Whereas in Barnett's claims, the coupons that are available to a particular user are based on the data profile the user has filled out. That is a different situation. Perhaps I'm wrong, but I thought in Von Cohorn they were based on the response units and the inputs of the individual user, then use those inputs to target which coupons to broadcast to them. Am I wrong? Am I misunderstanding Von Cohorn? My understanding of Von Cohorn is that is still a broadcast system. That is still a system where Von Cohorn is sending out those coupons rather than the user being able to select which coupons are available from the subset that is presented to them. Okay, but what about that language, though? At A201, column 47, lines 41 to 47, doesn't that specifically provide in Von Cohorn for the possibility that the user could initiate the request for the coupon? Am I misunderstanding that language? I would agree that the user, based on some of that language, could initiate the system, could initiate the request. That doesn't necessarily mean that as a broadcast system it has changed into one in which there is a data profile based on, the subset is based on the data profile that the user has already filled out and created with respect to that Internet site. So I still think it's a broadcast system. Part of the problem here, Your Honor, also is that here we're picking and choosing different embodiments of Von Cohorn to apply against the claims. Von Cohorn is a huge, very lengthy, detailed reference. Clearly, you can try to pick out one thing here, pick out another thing there. The problem, that is, again, that's hindsight. What you're doing is you're using— Your Honor, I think we'll have to bring your argument, your initial argument, I should say, to a close. You've used up your rebuttal time plus an additional three minutes, but you had a number of questions. So we'll give you your full two minutes on rebuttal. Thank you. And we'll hear from the Patent Office now. Mr. Stoll? Hey, please, Your Honor. I think Your Honors understand the issues. Essentially, if the Court agrees with the Board that it would have been obvious to modify Von Cohorn for use over the Internet, then the remaining modifications flow are dictated by that change from a television broadcast network to a wired communication Internet-based network. Did the Board find that as a matter of fact? What I'm wondering is how to handle that part of your statement because there's no doubt the Board said, oh, these would flow from this. But flow to whom? To one of ordinary skill in the art at that time, 1995, would have automatically known to make each and every one of these changes to the claim. Well, that's correct, Your Honor, but they also look to the references. As you pointed out at Column 47 of Von Cohorn, that's the appendix page at A201, it describes allowing customers in their home to access over a wired communication network,  which sure sounds an awful lot like the Internet. But I'd also like to address at the bottom of Column 46, at Line 65, we see a recitation in which the user interactively interfaces with the central station and pulls down this information. And this is appendix page 200 at Line 65 of Column 46. And I'll read it to you, if I may. The homes of such viewers would be wired, permitting individual ones of said viewers utilizing well-known means for electronically transmitting signals to a central receiving station to indicate a category or item of merchandise or services of particular interest. And it describes this alternative to an over-the-air transmission network described in the earlier perverted body myth into one that uses a wired communication network. And the Board concluded from that teaching and from Say's suggestion that it would have been obvious to one of ordinary skill in the art to look to Say, to look to the Internet, that is, because the Internet was already recognized by Say's filing date, 1994, as a super means for widely disseminating information, that the Board concluded it would have been obvious to make that modification. So from this overall change, the remaining changes were dictated, to refer back to your example of the football field versus the soccer field. Yes, once you've converted, or I'm sorry, the baseball field to the football field, once you've converted from one, the equipment associated with each sport, much like the equipment associated with television broadcast, needs to be updated to match that of the Internet, which had known equipment but slightly different equipment. And we can look to Barnett's own specification, where he admits that CompuServe, AOL, other Internet providers were known at the time of his filing date, that the general purpose computer that he describes was also known, and all the component parts of that device were known at the time. So Barnett, in fact, was taking known elements and combining them together. And I believe the Board correctly interpreted his claims as covering an Internet application for downloading. Okay, what about the specific claim limitation that he initially brought up? Downloading to the users, I'm reading from Claim 76, it's the little number three in 76. You know, I'm talking about downloading the software module. Yes, ma'am. What is the Board's position, or what is the Office's position, on how that particular limitation is disclosed in Von Cohorn, or Sage? I assume you're going to tell me Von Cohorn. Well, Von Cohorn has, I think, taught and then modified by the teaching of Sage to produce over the Internet. But yes, Your Honor, at column 16, it's important to note that Von Cohorn describes controlling the printer such that it'll print unique markings on these coupons so that they can be traced back. And to use the language of this, I'm sorry, this is at page A185. Column 16, and where are you in 16? Column 16, starting at line 30 and going all the way down to line 51. At line 30, the printer is described there as the device that marks different types of markings, including symbols, numbers, alphanumeric codes, and even machine-readable codes. And if you track the next few paragraphs, and if I can take you down to line 50, you'll see the purpose for these markings is to preclude tampering, forging, altering, counterfeiting. So the functionality of the software... But where is this? I'm confused. Where is it talking about downloading a software module? Your Honor, I'm describing the functionality that's available in Von Cohorn's printers. At column 2, the board particularly pointed to column 2, and that's at page 178, where Von Cohorn uses the word programming or programmed response unit, which using these instructions, these programming signals, controls the printer to function. This is at line 53 of column 2? That's correct. And the significance of my last citation was in response to Mr. Barnett's argument. In his reply briefs at 6, 7, and 8, he describes his software as providing this additional function that Von Cohorn does not have. But as we see at column 16, Von Cohorn, in fact, has that ability to control or to print these codes onto these coupons. And at the top of column 2, specifically at line 20, you'll see that the whole purpose for these codes is so that these coupons can be traced back to the household or the person that requested them after they were redeemed. What do you understand the scope of this appeal to be? Are we talking about analyzing each of these disputed claims independently, or are they all being argued together? As I read the opening brief, at least the argument section addressed to the 103 rejections did not tease apart the various claims. Do you understand this to be predicated on an all-stand-or-fall-together argument? I do, yes, and I think that's the position we took. The reply brief has material that teases apart the claims, but the opening brief did not seem to. Was there an acknowledgment to the effect of all or none at some point that I missed? Well, if you look at the appellant's initial brief, there's no specific claim that really is identified by them. It's this general attack on Von Cohorn's disclosure of the Internet and of a general purpose. That's a fair characterization of everything in the argument section, at least in the brief. Prior to that, they do discuss the claims separately, but the argument section does seem to be. And that's what you rely on for saying that it's an all or none? That's correct, Your Honor. We responded to the arguments that they presented in their brief, in our responsive brief. Well, unless the Court has anything further for me, I'll yield the rest of my time. Thank you, Mr. Stoll. Mr. Kramer, you have your two minutes of rebuttal. Thank you, Your Honor. In response to some of the points raised, let me address that last point from Judge Bressel first. Your Honor, we would contend that it's not an all or nothing situation. In our opening brief, certainly I believe in pages 38 to 41, we address different aspects of different claims that are not found in Von Cohorn, not found in Saig, or the combination thereof. So there are common elements, there are common arguments. Certainly that's why the cases were consolidated, but I believe we also raised different issues with respect to different claims. 38 to 41, you say? You discuss particular claims? You don't, in hyperbole, describe the claims. Certainly it's not a heading in our argument, Your Honor, but if you go, for example, to page 40, I believe that some of the things that are addressed there include various claims, if I'm not mistaken. And certainly, Your Honor, in our reply brief, we also tease that out. That may be a little too late, as you know. You can't raise new issues in a reply brief. I wouldn't say that we've raised new issues. Certainly in our opening brief, we addressed the factual details of each of the claims, so we would respectfully contend that we didn't waive those issues. Certainly there are common issues with respect to each of these claims. And we point those out in our reply brief to save time and space. These particular appeals were consolidated, and that's part of the reason. With respect to some of the points that were raised by counsel, the bond cohort teaches many different embodiments.